MALONE & HYDE, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent *
Malone & Hyde, Inc. v. Commissioner
Docket No. 5901-85
United States Tax Court
T.C. Memo 1993-585; 1993 Tax Ct. Memo LEXIS 601; 66 T.C.M. (CCH) 1551; December 14, 1993, Filed *601 Decision will be entered under Rule 155. In 1977, Malone & Hyde incorporated Eastland, a wholly owned foreign subsidiary, to carry on the business of insurance, reinsurance, and coinsurance. In 1978, Malone & Hyde and its subsidiaries began to insure risks with Northwestern, an unrelated insurance carrier, who, by prearrangement, reinsured the first $ 150,000 of worker's compensation, automobile liability, and general liability claims with Eastland and ceded premiums on such reinsurance to Eastland. The Commissioner determined that premium payments made by petitioner in 1979 and 1980 were not deductible to the extent those payments were ceded to Eastland. We sustained this determination in T.C. Memo. 1989-604. Petitioner moved for reconsideration of the Court's opinion and to reopen the record. We granted petitioner's motion, and a further trial was held. During the rehearing, petitioner presented evidence that Malone & Hyde charged back to its subsidiaries a portion of the premium payments made to Northwestern that were ceded to Eastland, thereby raising the brother-sister issue under Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), *602 affg. on parent-subsidiary issue and revg. on brother-sister issue 88 T.C. 197 (1987). Held, the portion of the insurance premiums ceded to Eastland that was charged back to the subsidiaries is deductible as ordinary and necessary business expense for insurance. Held further, the presence of a Hold Harmless Agreement and a foreign captive insurance company in this case does not change the conclusion that the requirements for insurance were met. For petitioner: John M. Bixler and Kevin L. Kenworthy. For respondent: Vallie C. Brooks. PARKER
PARKER
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's [1] Federal income tax as follows: Fiscal Year Ended
Deficiency
6/24/78
$  50,247.97
6/30/79
766,064.83
6/28/80
949,061.05
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for *603 the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We first decided this case in a Memorandum Opinion, T.C. Memo. 1989-604. In that opinion, we held that: 1. Malone & Hyde, Inc. (Malone & Hyde) was not entitled to deduct as ordinary and necessary business expenses those portions of the amounts it paid to Northwestern National Insurance Company (Northwestern) as insurance premiums in fiscal years 1979 and 1980 that were in turn paid by Northwestern to Malone & Hyde's wholly owned insurance subsidiary, Eastland Insurance, Ltd. (Eastland), as reinsurance premiums; 2. Malone & Hyde was entitled to deduct that part of its payments that constituted net additions to Eastland's case reserve for filed and uncontested worker's compensation claims; and 3. Malone & Hyde was not entitled to deduct, under section 461(f), any of the amount transferred by Eastland to GAB, a large, nationally known independent claims adjuster, for contested claims in the Loss Impress Fund, a bank account funded by Eastland and used to settle claims. After issuance of our opinion, petitioner filed a motion for reconsideration *604 of this Court's opinion and to supplement facts pursuant to Rule 161. At the original trial, petitioner did not raise the issue of whether or not Malone & Hyde's subsidiaries were entitled to deduct, as ordinary and necessary business expenses, their allocated portions of the amounts paid to Northwestern as insurance premiums and in turn paid by Northwestern to Eastland as reinsurance premiums. This "brother-sister corporation" issue was not raised because of this Court's prior adverse holding on the issue. However, in light of Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197 (1987), an opinion issued after trial and briefing in this case, petitioner argued for permission to supplement the original facts and to introduce evidence to show that this case falls squarely within the holding of the United States Court of Appeals for the Sixth Circuit in Humana concerning the brother-sister issue. [2] We granted petitioner's motion, and a further trial was held in this case. *605 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The supplemental stipulation of facts, the second supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner had its principal place of business at 3030 Poplar Avenue, Memphis, Tennessee, at the time of the filing of the petition. See supra note 1. We incorporate by reference and will not repeat our findings of facts in the original case, as set forth in T.C. Memo. 1989-604, but will focus on the facts necessary to understand and rule on the brother-sister issue. During all or part of the years at issue, the following eight corporations were wholly owned subsidiaries of Malone & Hyde: Middle Florida Supermarkets, Inc.; Raleigh Foods, Inc.; Stimson's Big Star #103; Petty's Drug Company, Inc.; Living Homes, Inc.; Hyde Insurance Agency, Inc.; Malone & Hyde, Inc. of Arkansas; [3] and UDISCO. Malone & Hyde owned Raleigh Foods, Inc., Hyde Insurance Agency, Inc., and Malone & Hyde, Inc. of Arkansas throughout the years at issue. Malone & Hyde's fiscal year commenced July 1st each year. Malone & Hyde filed consolidated *606 returns with these subsidiaries during the fiscal years at issue. Some of the subsidiaries were not owned by Malone & Hyde or were not in existence throughout all of the years at issue. The stock of Middle Florida Supermarkets, Inc. was acquired by Malone & Hyde on December 10, 1977. This subsidiary was subsequently liquidated into Malone & Hyde effective December 15, 1979, and thereafter operated as an unincorporated division of Malone & Hyde. Malone & Hyde organized Living Homes, Inc. on July 2, 1979, and owned that subsidiary continuously thereafter through the end of the fiscal years at issue. Malone & Hyde acquired Petty's Drug Company, Inc. on July 1, 1978, UDISCO on October 1, 1979, and Stimson's Big Star #103 on January 18, *607 1980, and after such dates owned those subsidiaries continuously through the end of the years at issue. Prior to the mid-1970s, Malone & Hyde maintained a master insurance policy with its insurer, CNA, for itself and its subsidiaries and divisions. Each subsidiary and division did not have its own individual policy but rather was named in and covered by the master policy. In the mid-1970s, Malone & Hyde and its wholly owned subsidiary, Hyde Insurance Agency, Inc., began to investigate alternative ways of obtaining adequate, yet less expensive, insurance coverage. After consulting with Risk Management, Inc. (RMI), an independent consulting firm in the business of developing and managing captive insurance programs, Malone & Hyde decided to change its primary insurance carrier and to create an insurance company subsidiary to reinsure selected risks. Eastland was incorporated in Bermuda on June 21, 1977, and was authorized to issue 120,000 shares at $ 1 par value. Malone & Hyde purchased all of these shares for $ 120,000. Under Bermuda's insurance law, Eastland was adequately capitalized. We assumed in the original opinion, and conclude here, that Eastland constituted an insurance *608 company. Although Eastland's board of directors determined that the initial activity of the company would include only reinsurance of selected risks of Malone & Hyde and its subsidiaries, it was decided that Eastland would later investigate obtaining participation in risks of unrelated parties. Throughout its existence, Eastland operated in the same manner as most other property and casualty insurance companies. It established certain reserve accounts in accordance with industry practice. It paid losses properly claimed and reflected profits on its books and records for the fiscal years at issue. After talking with several insurance companies to decide upon the company most suitable to function as the primary insurer of risks to be reinsured with Eastland, Malone & Hyde chose Northwestern, a large, highly regarded casualty insurance company in Milwaukee, Wisconsin. Once again, Malone & Hyde obtained a master insurance policy that covered itself and its subsidiaries and divisions. Whenever a new subsidiary was purchased, its existing insurance policies would be canceled, and it would be covered automatically by the Northwestern master policy. Whenever a new subsidiary was organized, *609 it too was covered by the master policy. An endorsement covering the new subsidiary would be added to the policy; but, regardless of the presence or absence of this endorsement, the new subsidiary's insurance needs were covered by the master policy. [4]
As prearranged, Northwestern entered a reinsurance agreement with Eastland, *610 whereby Northwestern would reinsure the first $ 150,000 of each worker's compensation, automobile liability, or general liability claim with Eastland. As noted in the original opinion, Malone & Hyde and its subsidiaries had good historical loss information as to these types of claims, which are considered predictable and less volatile than other types. Under the terms of the reinsurance agreement, Eastland provided Northwestern with an irrevocable letter of credit in the amount of $ 250,000, later increased to $ 600,000, to cover any amounts remaining unpaid under the reinsurance agreement. [5] In addition, Malone & Hyde entered into a Hold Harmless Agreement with Northwestern. [6]Malone & Hyde and Northwestern agreed, in consideration for the policies of insurance issued in favor of Malone & Hyde by Northwestern, that Malone & Hyde would not pursue against Northwestern any claim under those policies, and would hold Northwestern harmless and defend Northwestern against any claim under the policies from any third party in the event that Eastland defaulted on its obligations as reinsurer of Northwestern. During the fiscal years at issue, Eastland did not insure any risks of unrelated *611 third parties. Each year, Northwestern presented Hyde Insurance Agency, as insurance agent for Malone & Hyde, with a total annual renewal premium *612 for the master policy shortly before the beginning of the next coverage period. The policy period, which commenced July 1st each year, coincided with Malone & Hyde's fiscal year. Northwestern determined its exposure, and thus that year's premium, by assessing the number of vehicles and employees to be covered and by evaluating the sales figures of Malone & Hyde and its subsidiaries. Northwestern determined this premium using actuarial methods. However, Northwestern did not determine, nor have any role in determining, individual allocations for Malone & Hyde's subsidiaries and divisions, nor did it review Malone & Hyde's internal allocations of the premiums among its subsidiaries and divisions. For the policy period July 1, 1978, to July 1, 1979, Northwestern insured a total of 1,782 vehicles (818 private passenger vehicles, 382 tractors, and 582 trailers). For the policy period July 1, 1979, to July 1, 1980, Northwestern insured 1,836 vehicles (424 private passenger vehicles, 816 commercial vehicles, and 596 trailers). In addition, Northwestern provided 6,700 to 7,100 employees with worker's compensation coverage. Northwestern also provided general liability insurance coverage *613 for the physical facilities owned or operated by Malone & Hyde, its subsidiaries and divisions, including 15 wholesale food, institutional food, and retail drug distribution centers, 50 retail supermarket stores, 68 stamp redemption centers, 144 retail drug stores, 14 retail automobile parts stores, and 24 retail sporting goods stores. Fred R. Cline (Cline) was the risk manager of Hyde Insurance Agency's Risk Management Department from 1975 to 1985. He was involved in the formation of Eastland and was responsible for purchasing insurance for Malone & Hyde's subsidiaries and divisions. Cline presented a worksheet, titled "1980-81 Casualty Premium Allocations", that had been prepared by him and his staff in June of 1980. This worksheet reflects premium allocations for the policy period from July 1, 1980, through July 1, 1981. When the Risk Management Department received the renewal premium from Northwestern, the department allocated to each subsidiary and division [7] its share of that annual premium, based on loss figures for the preceding 3 years, up to and including the most recent figures available up to April of 1980. *614 The allocations of the total premium to the subsidiaries initially were based on the loss activity experienced by the three operating segments, within which each subsidiary fell. These segments were retail grocery operations, wholesale grocery operations, and related operations. For example, if the retail grocery operations experienced 21.02 percent of the total losses, then 21.02 percent of the total premium would be charged back to that segment. Each vice president heading one of these operating segments would be vitally concerned that his segment's allocation, as well as the individual allocations to the subsidiaries within his segment, be determined properly because the allocations would directly impact his profit center and the potential bonuses of the segment. In determining an individual subsidiary's projected premium allocation, Cline would first determine the total of that subsidiary's prior 3 years' premiums. He would also determine the subsidiary's total losses for the prior 3 years. A loss ratio would then be calculated by dividing the total losses figure, the numerator, by the total premiums figure, the denominator. Cline considered that, if a subsidiary were *615 "in line", it should not have more than a 50-percent loss ratio. This 50-percent ratio is a generally recognized figure in the insurance industry. For every dollar of premium that it is paid, an insurance company strives to set aside 50 cents for administrative expenses and any profit and 50 cents for the payment of claims. Therefore, the Risk Management Department decided that, if a subsidiary's loss ratio exceeded the expected 50-percent figure, that subsidiary's prior year's premium would be increased by the excess. Each subsidiary's projected premium was then compared with the total projected premium for its segment in order to determine its percentage of participation. This percentage was then used to determine a subsidiary's share of participation in its segment's total actual premium as billed by Northwestern. For example, the total projected premium in 1980-1981 for the retail operations was $ 564,728. Raleigh Foods Inc.'s projected premium of $ 6,846 represented almost 1.22 percent of $ 564,728. Raleigh Foods Inc.'s actual premium was $ 8,556, which was 1.22 percent of the actual premium of $ 701,275 billed by Northwestern. Once the allocations had been determined, *616 Hyde Insurance Agency prepared quarterly billing statements from the worksheet for each subsidiary. Larry J. Pfeifer (Pfeifer), an accounting manager for the Hyde Insurance Agency during the years at issue, collected from the subsidiaries the allocation amounts shown on the worksheet and on the billing statements. Each subsidiary actually issued a check to Hyde Insurance Agency in payment of its allocated amount. The total amounts billed to, and paid by, the eight subsidiaries of Malone & Hyde for such insurance were $ 172,413 for 1979 and $ 218,900 for 1980: [8]
1979
1980
Middle Florida Supermarkets, Inc.
$ 103,149
$  65,161
Raleigh Foods, Inc.
4,824
5,266
Stimson's Big Star #103 *
13,168
Petty's Drug Company, Inc.
52,653
47,039
Living Homes, Inc. *
12,779
Hyde Insurance Agency, Inc.
4,012
6,389
Malone & Hyde, Inc. of Arkansas
7,775
6,389
UDISCO *
62,709
$ 172,413
$ 218,900
* Not in the insurance program at this time.
*617 At the end of the policy year, Northwestern audited that year's loss experiences of Malone & Hyde and its subsidiaries and adjusted the premium amount accordingly. These adjustments would be reflected in the next policy year's allocations because it would have been too difficult at that time to identify which operations had the adjustments and to recompute the worksheet. When new subsidiaries were acquired, Cline evaluated their insurance invoices and policies to determine the premiums that they had paid in prior years. Northwestern would also adjust the total premium during the year-end audit to reflect the addition of a subsidiary during the year. Cline used the new subsidiary's past records to initially calculate its allocation amount and Northwestern's subsequent audit figures to adjust the allocation. The premiums that the new subsidiaries were allocated and charged were less than the amounts that they had been paying prior to being acquired. This allocation method used by the Hyde Insurance Agency's Risk Management Department during the years at issue was consistently in use for several years, even before the formation of Eastland. Other large companies, in the food *618 industry for example, employ basically the same type of allocation program or chargeback of premiums to their divisions and subsidiaries. Northwestern did not evaluate Malone & Hyde's allocation method. There was no need for such a review by Northwestern because the Hyde Insurance Agency's Risk Management Department had the internal capabilities necessary to determine the appropriate rates and allocations since Hyde Insurance Agency was a full-service insurance agency in the business of obtaining insurance policies from various major insurance companies and quoting premiums. Also Northwestern was concerned with payment of the total premium it needed to cover its exposure, not with the sources of payment from within Malone & Hyde and its subsidiaries. Worksheets similar to the one placed into evidence also had been prepared for 1978-1979 and 1979-1980, but representatives of petitioner have not been able to locate these documents. A thorough search of the Risk Management Department's records as well as of Malone & Hyde's records was conducted to find the worksheets or quarterly billing statements for 1979 and 1980, but they were not found. These documents are presumed to have *619 been either lost or accidentally destroyed. However, such worksheets had existed and had been prepared in the same manner as the 1980-1981 worksheet. This 1980-1981 worksheet establishes that $ 172,413 was charged to the subsidiaries in 1979 and $ 218,900 was charged in 1980. See supra note 8. OPINION Our holding in T.C. Memo. 1989-604 regarding the parent-subsidiary issue remains unchanged. [9] As we stated in that opinion, we have held, in a number of cases similar to the present one, that the parent corporation's direct or indirect payments to the captive subsidiary, designated as insurance or reinsurance premiums, do not represent payments for "insurance" and hence are not deductible as insurance payments.[10]Humana Inc. v. Commissioner, 88 T.C. 197 (1987), affd. on this parent-subsidiary issue 881 F.2d 247 (6th Cir. 1989); Clougherty Packing Co. v. Commissioner, 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987); Carnation Co. v. Commissioner, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981). *620 Such an arrangement is merely equivalent to a reserve for losses or self-insurance, which is not deductible for Federal tax purposes. Anesthesia Service Medical Group, Inc. v. Commissioner, 85 T.C. 1031, 1045-1046 (1985), affd. 825 F.2d 241 (9th Cir. 1987); Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78 (10th Cir. 1930). Neither party in this case has called upon us to reconsider this established holding, nor does the opinion of the Court of Appeals for the Sixth Circuit in Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197 (1987), require us to do so. *621 Petitioner's motion to supplement facts and for reconsideration of the opinion has raised what is commonly known as the "brother-sister corporation" issue. Petitioner did not raise this issue at the original trial, but now has presented evidence that Malone & Hyde charged back to its subsidiaries portions of those payments it made to Northwestern as insurance premiums that were then ceded to Eastland as reinsurance premiums. Petitioner contends that the situation at hand falls squarely within the Sixth Circuit's holding in Humana Inc. v. Commissioner, supra. Any appeal in the present case would lie to the United States Court of Appeals for the Sixth Circuit. Under the Golsen rule, we are bound to follow the clear legal precedent of that circuit. Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Respondent agrees that the Sixth Circuit's opinion in Humana Inc, v. Commissioner, supra, sets the analytical framework and precedent to be followed in this case but contends that a number of factors sufficiently *622 distinguish the present case from Humana so as not to be within its holding. Respondent first contends that the presence of the Hold Harmless Agreement and the letters of credit results in an absence of risk shifting.[11] *623 Respondent also attempts to distinguish this case from Humana by arguing that Eastland is an inadequately capitalized foreign subsidiary not subject to any State or domestic governmental regulatory control. Respondent points out that, in discussing risk shifting, the Sixth Circuit indicated that those and certain other factors were significant to its conclusion. [12] Respondent contends most of those factors are not present in this case. Respondent also refers to the Sixth Circuit's footnote 2 in Humana as further support for this position.[13] Finally, respondent argues that there is no insurance in this case because Malone & Hyde's internal allocations were not actuarially determined. *624 Petitioner disputes respondent's contentions and asserts that the payments from the subsidiaries to the captive are deductible insurance premiums. Section 162 allows as a deduction all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business. Section 1.162-1(a), Income Tax Regs., provides that insurance premiums against fire, storm, theft, accident, or other similar losses in the course of business constitute business expenses. On the other hand, a company may not deduct amounts set aside in a reserve or self-insurance program to cover future losses, even if those funds are monitored by an independent agent or insurance company. See Steere Tank Lines, Inc. v. United States, 577 F.2d 279 (5th Cir. 1978); Spring Canyon Coal Co. v. Commissioner, supra.
The Internal Revenue Code does not define the term "insurance". Moreover, the regulations do not set forth a legal standard to be applied in determining whether or not payments to a captive insurance company constitute ordinary and necessary business expenses for insurance. Thus, this and other courts have *625 addressed these omissions by using the Supreme Court's definition of insurance in Helvering v. Le Gierse, 312 U.S. 531, 539 (1941): an insurance contract must involve (1) risk shifting and (2) risk distribution.[14]
This Court, in its more recent captive insurance cases, has developed a multi-pronged framework for the inquiry into the existence of insurance: in addition to the presence of risk shifting and risk distribution, we look to see if the transaction involves "insurance risks" (a bona fide potential hazard as opposed to an investment risk) and whether or not insurance in its commonly accepted sense exists. Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61 (1991), *626 supplemental opinion 96 T.C. 671, affd. in part and revd. in part 972 F.2d 858 (7th Cir. 1992); The Harper Group & Includible Subsidiaries v. Commissioner, 96 T.C. 45 (1991), affd. 979 F.2d 1341 (9th Cir. 1992); AMERCO v. Commissioner, 96 T.C. 18 (1991), affd. 979 F.2d 162 (9th Cir. 1992). [15]
Both petitioner and respondent agree that the Sixth Circuit's decision in Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), governs the decision in this case. The Sixth Circuit agreed *627 that this Court correctly held on the parent-subsidiary issue, under the principles of Clougherty and Carnation, that the premiums paid by Humana Inc., the parent, to Health Care Indemnity, its wholly owned subsidiary, did not constitute insurance premiums and, therefore, were not deductible as business expenses under section 162(a). Humana Inc. v. Commissioner, supra at 251; Clougherty Packing Co. v. Commissioner, supra; Carnation Co. v. Commissioner, supra. However, the Sixth Circuit reversed our holding on the brother-sister issue and ruled that the premiums paid by the subsidiaries of Humana Inc. to Health Care Indemnity, as charged back to them by Humana Inc., constituted payments for valid insurance agreements and were deductible. In applying the Supreme Court's test for insurance as set forth in Le Gierse, [16] the Sixth Circuit described these terms as follows: Risk shifting involves the shifting of an identifiable risk of the insured to the insurer. The focus is on the individual contract between the insured and the insurer. Risk distribution involves shifting to a group of *628 individuals the identified risk of the insured. The focus is broader and looks more to the insurer as to whether the risk insured against can be distributed over a larger group rather than the relationship between the insurer and any single insured. Commissioner of Internal Revenue v. Treganowan, 183 F.2d 288, 291 (2nd Cir.), cert. denied, 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625 (1950).
Humana Inc. v. Commissioner, 881 F.2d at 251. The Sixth Circuit concluded in Humana that this Court had incorrectly extended the rationale of Carnation and Clougherty, as well as Stearns-Roger Corp. v. United States, 774 F.2d 414 (10th Cir. 1985), and Mobil Oil Corp. v. United States, 8 Cl. Ct. 555 (1985), *629 in deciding that valid insurance contracts did not exist between the subsidiaries and the captive insurance subsidiary. Humana Inc. v. Commissioner, 881 F.2d at 253. The Sixth Circuit held that Carnation and Clougherty specifically do not provide a basis for denying premium deductions in the brother-sister situation because those cases exclusively addressed the parent-subsidiary issue. In addition, the Sixth Circuit further stated that Stearns-Roger and Mobil Oil also should not be extended to this situation because those cases were based on the economic family theory, a theory rejected by this Court as well as the Sixth Circuit. [17]
*630 In generally applying the Le Gierse test in the brother-sister situation, the Sixth Circuit expressly rejected the economic family theory and stated that a parent corporation, its subsidiaries, and the captive insurance subsidiary must be treated as separate corporate entities as required by Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). [18] The Sixth Circuit in Humana criticized this Court for misapplying the "substance over form" analysis, absent a finding of sham or lack of business purpose. Humana Inc. v. Commissioner, 881 F.2d at 254-255. In our Humana opinion, we concluded that, if we did not deny the deductions in the brother-sister context, Humana Inc. would avoid our holding on the parent-captive issue and would accomplish indirectly through its subsidiaries what it could not accomplish directly. We attempted to reclassify, under a substance over form or "economic reality" analysis, the insurance premiums paid by the subsidiaries as nondeductible additions to a reserve for losses. *631 However, in our analysis, we found that Humana Inc. had a valid business purpose for incorporating Health Care Indemnity. Since "Congress has manifested no intent to disregard the separate corporate entity in the context of captive insurers" ( Humana Inc. v. Commissioner, 881 F.2d at 255), and since there was no sham corporation or lack of business purpose, the Sixth Circuit accordingly concluded that there was no legal justification for our reclassification of the insurance transaction in that case. The test continues to be the Le Gierse test for insurance: The legal test is whether there had been risk distribution and risk shifting, not whether Humana Inc. is a common parent or whether its affiliates are in a brother-sister relationship to Health Care Indemnity. We do not focus on the relationship of the parties per se or the particular structure of the corporation involved. We look to the assets of the insured. Clougherty, 811 F.2d at 1305. If Humana changes its corporate structure and that change involves risk shifting and risk distribution, and that change is for a legitimate business purpose and *632 is not a sham to avoid the payment of taxes, then it is irrelevant whether the changed corporate structure has the side effect of also permitting Humana Inc.'s affiliates to take advantage of the Internal Revenue Code § 162(a) (1954) and deduct payments to a captive insurance company under the control of the Humana parent as insurance premiums. [Emphasis added.]
Humana Inc. v. Commissioner, 881 F.2d at 255-256. The Sixth Circuit's focus on the assets of each insured led that court to distinguish the economic realities of the brother-sister situation from those of the parent-subsidiary relationship. Humana Inc. v. Commissioner, 881 F.2d at 253. The parent shows the captive's stock as an asset on its balance sheet. If the captive insurer must pay a loss of the parent, the captive's assets are diminished, which in turn, reduces the value of the captive's stock as an asset of the parent. Thus, the parent corporation has not shifted its risk of loss because it bears the adverse economic impact of the loss regardless of the presence of this "insurance" arrangement. But, in the brother-sister situation, the subsidiary *633 that sustains the loss is made whole by receipt of the insurance proceeds from the captive and does not have a corresponding decrease in its assets or net worth because it does not own any stock in the captive. That is to say, an insurance claim that the captive must pay would not adversely impact the assets of each insured affiliate because the wholly separate captive subsidiary, albeit a related corporation, has a pool of premiums from which to draw and is solely responsible for the loss. Therefore, upon payment of its premiums, a subsidiary successfully shifts its risks to the captive. Risk distribution can also be present in the brother-sister situation if the captive is able to spread losses sufficiently among the separate corporations within the affiliated group. Humana Inc. v. Commissioner, 881 F.2d at 256-257. Thus, the Sixth Circuit concludes that the two-prong test of Le Gierse can be met in the brother-sister context. Consequently, payments made by, or on behalf of, affiliates can constitute insurance premiums that are deductible business expenses. In applying the Le Gierse test, as well as our own multi-pronged analytical framework *634 to the case at hand, we conclude that bona fide insurance risks existed, that risk shifting and risk distribution were present, and that the arrangements among Malone & Hyde, its subsidiaries, Northwestern, and Eastland constituted insurance in the commonly accepted sense. We, therefore, hold that the payments made by Malone & Hyde, on behalf of and charged back to its subsidiaries, constitute insurance premiums that are deductible business expenses under section 162. I. Existence of Insurance Risks We have previously held that: Basic to any insurance transaction must be risk. An insured faces some hazard; an insurer accepts a premium and agrees to perform some act if or when the loss event occurs. If no risk exists, then insurance cannot be present.
The Harper Group & Includible Subsidiaries v. Commissioner, 96 T.C. at 58; AMERCO v. Commissioner, 96 T.C. at 38-39; see also Helvering v. Le Gierse, 312 U.S. at 539. In this case, the various subsidiaries of Malone & Hyde faced substantial potential worker's compensation, automobile, and general liability risks. These risks *635 were transferred to Northwestern and subsequently to Eastland in bona fide insurance arrangements upon payment of premiums. As we found in The Harper Group, Eastland's acceptance of these risks and its exposure, up to $ 150,000 per claim, were real, not illusory. The Harper Group & Includible Subsidiaries v. Commissioner, 96 T.C. at 58. Therefore, insurance risks existed in this case. II. Risk Shifting In order to determine if the requisite risk shifting had occurred, the Sixth Circuit in Humana applied the Ninth Circuit's balance sheet test in Clougherty because that analysis maintains the separate legal status of the various corporate entities consistent with the principles of Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Humana Inc. v. Commissioner, 881 F.2d at 252. This balance sheet test determines if risk shifting is present by studying the insured's assets. True insurance must relieve the insured of the adverse financial consequences of sustaining the losses and risks against which he has tried to insure. Thus, the Sixth Circuit concluded that *636 risk shifting had occurred in Humana because, "If we look solely to the insured's assets, i.e., those of the various affiliates of Humana Inc., and consider only the effect of a claim on those assets, it is clear that the risk of loss has shifted from the various affiliates to Health Care Indemnity." Humana Inc. v. Commissioner, supra at 252. Likewise, when we apply this method of analysis to the situation at hand, Malone & Hyde's subsidiaries have successfully shifted their risk of loss to Eastland. As the Sixth Circuit observed, the economic reality of insurance between subsidiaries and a captive insurance company, where the subsidiaries own no stock in the captive and vice versa, is one in which the subsidiaries' balance sheets and net worth are not adversely affected when a loss is sustained by a subsidiary and payment is made by the captive insurance subsidiary. Humana Inc. v. Commissioner, 881 F.2d at 253. The subsidiaries of Malone & Hyde have shifted their risk of loss because their financial obligations regarding sustained losses ended with payment of their insurance premiums. For various reasons, *637 respondent continues to argue against this result. A. Presence of Hold Harmless Agreement and Letters of Credit Consistent with the Sixth Circuit's method of analysis of the risk shifting issue, we conclude that the Hold Harmless Agreement and letters of credit in this case do not change our conclusion that risk shifting has occurred. We must look only at the insured's assets and the impact that a claim of loss would have on them. Even if we assume the worst case scenario, that a subsidiary sustains a loss that Eastland is unable to cover and that Malone & Hyde must pay pursuant to the Hold Harmless Agreement, the subsidiary's assets are not affected. The subsidiaries were not parties to the Hold Harmless Agreement between Malone & Hyde and Northwestern or the letters of credit between Eastland and Northwestern. They did not agree in any way to contribute to Eastland's capital or to pay any losses should Eastland be unable to perform its obligations. From the subsidiaries' perspective, the Hold Harmless Agreement and letters of credit merely provided additional assurance that their insured losses would be paid and that they would not have to bear their own losses. Their *638 financial obligations regarding claims for losses ended with payment of their allocated shares of the premium. Thus, the subsidiaries have shifted their risk of loss regardless of the presence of the Hold Harmless Agreement between Malone & Hyde and Northwestern or the letters of credit between Eastland and Northwestern. We found in Carnation, and further articulated in Clougherty, that the capitalization agreement was not a critical factor in the outcome of the case, but only one of several factors to be considered in determining whether or not the requisite risk shifting was present. Carnation Co. v. Commissioner, supra; Clougherty Packing Co. v. Commissioner, 84 T.C. at 956. The parent's assets would be adversely affected in the worst case scenario, but under the principles of Moline Properties, Inc. v. Commissioner, supra, as applied by the Sixth Circuit, this fact has no significance in determining whether a brother or sister corporation has shifted the risk of loss from itself to a captive insurance subsidiary. The Sixth Circuit's footnote 2 in Humana Inc. v. Commissioner *639 , supra (see supra note 13), does not call for a different result, as respondent suggests. That footnote may indicate that the presence of indemnification agreements or undercapitalized captives alone was a sufficient basis to determine the absence of risk shifting in the parent-subsidiary situation. The Sixth Circuit, in the main body of text to which footnote 2 is appended, discusses its determination that the cases referred to in that footnote dealt only with the parent-subsidiary issue and do not provide a basis for denying insurance premium deductions in the brother-sister situation. Therefore, we think the Sixth Circuit clearly did not intend to make its footnote applicable to, let alone dispositive of, the brother-sister situation. Respondent further argues that, although the arrangement in this case appears to be an insurance policy as commonly understood by the insurance industry, the reinsurance contract herein cannot be considered a bona fide arm's-length agreement in view of the letters of credit and the Hold Harmless Agreement required by Northwestern. Respondent speculates that the letters of credit and the Hold Harmless Agreement would not be necessary if *640 the reinsurance policy represented a legitimate contract for which a premium was paid for risk shifting and risk distribution. We do not agree with respondent's speculations. We are satisfied that Malone & Hyde, Eastland, and Northwestern engaged in bona fide arm's-length negotiations in entering into their insurance and reinsurance contracts. Northwestern is a large, well-respected insurance company that is not related to either Malone & Hyde or Eastland. Northwestern's requirement of a Hold Harmless Agreement and letters of credit reflects reasonable, cautious business practices in dealing with a new customer and a new reinsurer. Northwestern made these requests for its financial protection and in return for a competitive premium quote. The Hold Harmless Agreement and letters of credit effectively would have had viability only in the event that Eastland were unable to meet its obligations under the reinsurance agreement. Again the subsidiaries are not involved and while the presence of such additional agreements may afford them even more protection, it does not change the fact that their risk has been shifted to the captive insurer. Therefore, we conclude that the contracts *641 entered into between Malone & Hyde and Northwestern and between Northwestern and Eastland represent bona fide insurance contracts in the brother-sister situation. B. Eastland's Status as Insurance Company
Respondent has also raised the issue of whether or not Eastland constituted an adequately capitalized insurance company to which risks could be shifted. The Sixth Circuit's opinion in Humana Inc. v. Commissioner, supra, notes that Health Care Indemnity was a domestic insurance company monitored by the State of Colorado and was sufficiently capitalized. However, here respondent has suggested that the mere fact that Eastland was incorporated in Bermuda with $ 120,000 in capital should lead us to summarily conclude that "insurance" could not be present in this case. Petitioner has countered by pointing out that Eastland was organized and operated for valid business purposes and not as a sham corporation to avoid taxes. As previously discussed, the Sixth Circuit has stated that a court cannot disregard a corporate entity in the name of economic reality or substance over form absent a finding of sham or lack of business purpose. Humana Inc. v. Commissioner, 881 F.2d at 255, *642 referring to Clougherty Packing Co. v. Commissioner, 811 F.2d at 1302. Thus, absent some indication that Eastland was a sham corporation or that there was no business purpose for its organization, we cannot make the leap in logic respondent asks us to make. Eastland was adequately capitalized according to Bermuda's insurance law. The record establishes that Eastland was formed for legitimate business purposes. We have found that Eastland operated in the same manner as other insurance companies. It established reserve accounts, paid claimed losses only after the validity of those claims had been established, and was profitable, much in accordance with industry standards. The policies into which it entered were valid and binding. All of these factors cumulatively indicate that Eastland was a valid insurance company. Respondent again contends that footnote 2 of the Sixth Circuit's Humana decision justifies disallowance of insurance deductions in this case. See supra note 13. We again disagree. Footnote 2 deals only with the parent-subsidiary situation and is not determinative in this case. Also the holdings in Carnation Co. v. Commissioner, supra, *643 and Beech Aircraft Corp. v. United States, 797 F.2d 920 (10th Cir. 1986), discussed in that footnote, did not turn upon the adequacy of the capitalization of the captive.[19] Therefore, the mere fact of a foreign captive insurance company, absent a finding of sham or lack of business purpose, does not lead us to conclude that insurance does not exist. *644 C. Other Factors Affecting Risk Shifting Respondent also argues that no risk shifting has occurred because Malone & Hyde did not actuarially determine the premium allocations charged back to the subsidiaries. Respondent refers to footnote 15 of Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1027-1028 (1987), to support this contention.[20] *646 We have found that Northwestern determined the premium it charged Malone & Hyde through reasonable, actuarial methods. This determination is the critical one referred to in Gulf Oil. The allocation method chosen by Malone & Hyde to charge back the premiums to the subsidiaries need not be actuarial per se, but merely a consistent and reasonable method reflecting the subsidiaries' usage of the insurance. See Humana Inc. v. Commissioner, 88 T.C. at 203 n.10. Malone & Hyde's allocation method had been used for years and was one that other large grocery companies also used. There is no indication that the allocations were overstated or understated. The vice presidents in charge of the three operating segments were aware of Malone & Hyde's allocation method and were motivated by *645 their economic self-interest to monitor closely the amounts they were charged. Some seeming inconsistencies between the premiums charged to and the losses sustained by certain subsidiaries were discussed in respondent's brief; petitioner's answering brief explains these matters to the satisfaction of the Court. [21] *647 Malone & Hyde's allocation method was reasonable and took into account each subsidiary's actual or constructive insurance payments and losses for the 3 preceding years. Thus, we do not find convincing respondent's argument that this method was deficient or somehow less sound than the method used in Humana. [22]
III. Risk Distribution We also conclude that risk distribution is present in this case. Risk distribution is viewed as accomplishing one or more of the following: (1) spreading losses among insureds; (2) providing an insurance company with a pool of premiums from which to pay losses; and (3) serving as a prerequisite to the application of the "law of large numbers". [23] Taylor, "Taxing Captive Insurance: A New Solution for an Old Problem", 42 Tax Lawyer 859, 876 (1989). *648 Respondent argues that there are too few subsidiaries in this case to have achieved risk distribution. As we stated in Gulf Oil, "risk transfer and risk distribution occur only when there are sufficient unrelated risks in the pool for the law of large numbers to operate." (Fn. ref. omitted.) Gulf Oil Corp. v. Commissioner, 89 T.C. at 1025. We also stated in Gulf Oil, 89 T.C. at 1026, that, in the right circumstances, a "single insured can have sufficient unrelated risks to achieve adequate risk distribution." (Fn. ref. omitted.) Without holding that a specific number of subsidiaries or risk events are required, we conclude in this case that the eight Malone & Hyde subsidiaries sufficiently contributed to the pool of premiums. During the years at issue, Eastland provided worker's compensation coverage for 6,700 to 7,100 employees of Malone & Hyde, its subsidiaries and divisions; automobile liability coverage for 1,800 automobiles, trucks, and trailers; and general liability coverage for most of petitioner's warehouses and retail stores. Commentators have noted that "when an insurer has a sufficiently large number *649 of risks such that great variations in aggregate losses are unlikely, and the premiums received plus its capital make it a viable risk bearer, one can say that risk distribution is present regardless of the number of insureds covered." Winslow, "Tax Avoidance and the Definition of Insurance: The Continuing Examination of Captive Insurance Companies", 40 Case Western Reserve L. Rev. 79, 152 (1989-90). Respondent interprets the Sixth Circuit's discussion in Humana as suggesting that numerous insureds must be present to achieve risk distribution. The Sixth Circuit concluded that "we see no reason why there would not be risk distribution in the instant case where the captive insures several separate corporations within an affiliated group and losses can be spread among the several distinct corporate entities." Humana Inc. v. Commissioner, 881 F.2d at 257. It is clear from the Sixth Circuit's opinion that, when several separate corporations are present, risk distribution ordinarily is present. However, we do not think the Sixth Circuit meant to foreclose the ability of a few insureds with many different insurable risks to demonstrate that they also *650 had achieved risk distribution. We conclude that petitioner has demonstrated the presence of risk distribution in this case. Although at most only eight subsidiaries, as compared with between 22 and 48 subsidiaries in Humana, participated in the reinsurance agreement, worker's compensation, automobile liability, and general liability claims involve diverse risks and potentially represent thousands of individual loss events. Eastland chose to reinsure these risks because there was good historical loss information on them and such risks were considered predictable and less volatile than other types of risks. Therefore, Eastland was able to predict with reasonably high probability the losses that potentially could occur and the pool of premiums it would need to cover them, rendering it a viable risk bearer. IV. Insurance in its Commonly Accepted Sense As discussed above, Eastland was both organized and operated as a valid insurance company and was not a sham corporation. It was regulated by the authorities of Bermuda, and its capitalization was adequate under Bermuda law. The insurance agreements between Malone & Hyde and Northwestern and the reinsurance agreements between *651 Northwestern and Eastland were the result of arm's-length negotiations and were properly evidenced by written policies and endorsements. The reinsurance policies issued by Eastland were valid and binding. Eastland operated as a separate and viable entity, financially capable of meeting its obligations. In sum, the arrangements among Malone & Hyde, its subsidiaries, Northwestern, and Eastland constituted insurance in the commonly accepted sense. See The Harper Group & Includible Subsidiaries v. Commissioner, 96 T.C. at 60. V. Conclusion We conclude that petitioner has established that risk shifting and risk distribution occurred with respect to the portion of the subsidiaries' allocated premiums that represents payment for reinsurance of their losses by Eastland. In addition, this Court's requirements of the presence of bona fide insurance risks and insurance in the commonly accepted sense have been satisfied. Accordingly, we hold that all of the allocated payments made by the eight subsidiaries of Malone & Hyde constitute insurance premiums that are deductible business expenses under section 162. Thus, having held that the portion of the *652 allocated payments made by the subsidiaries in this case for reinsurance with Eastland are insurance premiums and, hence, deductible business expenses, we note respondent's final contention that petitioner has failed to demonstrate what portion, if any, of the disallowed reinsurance premiums are attributable to any of the subsidiaries. We disagree. The record reflects the net amount of reinsurance premiums disallowed for all three operating segments of Malone & Hyde. Second, petitioner has established that Hyde Insurance Agency's Risk Management Department used a reasonable method for allocating the total insurance premiums of the three operating segments to Malone & Hyde's subsidiaries and divisions. Hence, in the Rule 155 proceedings the parties should use this allocation method and the figures available in the record to determine the amount of the disallowed reinsurance premiums to which each subsidiary is entitled. If the parties cannot agree as to what amounts have and have not been allowed to date, the Court will resolve these matters in any further proceedings under Rule 155. See supra note 8. Decision will be entered under Rule 155. Footnotes
*. See Malone & Hyde, Inc. and Subsidiaries v. Commissioner, T.C. Memo. 1989-604.↩
1. Petitioner herein refers to both Malone & Hyde, Inc. and its subsidiaries.↩
2. Any appeal in this case would lie to the United States Court of Appeals for the Sixth Circuit. Under the Golsen rule, we are bound to follow the clear legal precedent of that circuit. Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).
3. The parties' Second Supplemental Stipulation refers to this subsidiary as "Malone & Hyde of Arkansas, Inc.". However, the Supplemental Stipulation and various exhibits refer to the subsidiary as "Malone& Hyde, Inc. of Arkansas", and this is the name we shall use in this opinion.↩
4. Respondent questioned whether or not these endorsements existed since some of the insurance policy documents offered into evidence appeared to be incomplete. Petitioner has convinced us that the missing endorsements had once existed and that the documents at one time had been complete although they were not complete at the rehearing. Moreover, we find that the automatic pick-up provision in the master policy was designed to protect the insured against an oversight in the issuance of an endorsement. Thus, regardless of the presence or absence of the endorsement pages in the policy documents offered into evidence, we find that Malone & Hyde's subsidiaries were covered by the master policy.↩
5. This letter of credit was amended on February 4, 1980, to increase the amount of the letter of credit to $ 600,000, effective as of January 1, 1980.↩
6. As we explained in T.C. Memo. 1989-604↩, a Hold Harmless Agreement is a contractual arrangement whereby one party assumes the liability in a situation, thereby relieving the other party of responsibility. After the audit began in this case, a letter dated July 20, 1982, from Northwestern purported to retroactively revoke the Hold Harmless Agreement. At the same time, Eastland was required not to declare or pay any dividends or make any distribution on any of its capital stock or make any loans directly or indirectly to any stockholder that would cause Eastland's capital or surplus to be reduced below $ 1.5 million. Also, Eastland's letter of credit to Northwestern had to be increased.
7. The divisions referred to herein are unincorporated parts of the parent, not separate entities. However, Malone & Hyde treated its divisions as subsidiaries for purposes of determining their shares of the total premium payment. These shares were then paid, in effect, by Malone & Hyde and thus are not at issue. Hence, we will discuss the method of allocation of the total premium in terms of only the subsidiaries, although the same method applied to both the subsidiaries and the divisions.↩
8. These figures represent gross premiums paid to Northwestern to insure against losses above $ 150,000 and indirectly paid to Eastland through Northwestern to insure against losses of $ 150,000 and less. Respondent argues that portions of these premium allocations have already been allowed to either Malone & Hyde or its subsidiaries as direct insurance premiums and commissions paid to Northwestern, reinsurance premiums paid to third-party insurance companies, losses paid or payable by Eastland, or a claims service fee paid by Eastland. References to specific adjustments for these allowances were made in our Memorandum Opinion, T.C. Memo. 1989-604↩. Those adjustments as well as any other adjustments established herein will be made in the Rule 155 proceedings.
9. Our holdings regarding the other issues, as outlined earlier, also remain unchanged.↩
10. The captive subsidiary in this case did not provide insurance for unrelated insureds in the years at issue. On occasion, we have held that, when a sufficient number of unrelated insureds are involved, a parent's payments to its captive can constitute insurance premiums. See Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61 (1991), supplemental opinion 96 T.C. 671, affd. on this issue and revd. on another issue 972 F.2d 858 (7th Cir. 1992). As we noted therein the Sears case is distinguishable from prior cases involving the characterization of payments by the parent to the subsidiary as insurance, and the insurance subsidiary therein was not a "captive insurance company" as that term had been used in prior cases, 96 T.C. at 89-90↩.
11. This Court noted in its original opinion, T.C. Memo. 1989-604↩, that "Also we need not consider the letters of credit and the hold harmless agreement in this case, facts that might establish that no shifting of risk occurred in any event." However, that was stated in the parent-subsidiary context.
12. The Sixth Circuit noted that the captive in Humana Inc. v. Commissioner, 881 F.2d 247, 253 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197↩ (1987), met the insurance requirements of the State of Colorado; the captive was formed for valid business reasons and was fully capitalized; there was no agreement under which the parent or subsidiaries would contribute additional capital to the captive; the captive and subsidiaries entered into bona fide arm's-length agreements; there was no suggestion that the premiums were overstated or understated; the captive did not file returns on a consolidated basis with the parent or subsidiaries; and there was no stock ownership between the subsidiaries and the captive.
13. Footnote 2 reads as follows: The Carnation case involved an undercapitalized foreign captive, with a capitalization agreement running to the captive from the parent. Stearns-Roger, although involving an adequately capitalized domestic captive, involved an indemnification agreement running from the parent to the captive. A third case, Beech Aircraft, 797 F.2d 920 (10th Cir. 1986), mentioned as support for the majority position, also involved an undercapitalized captive. These weaknesses alone provided a sufficient basis from which to find no risk shifting and to decide the cases in favor of the Commissioner. The Humana case contained no such indemnification agreement and Health Care Indemnity was adequately capitalized.
Humana Inc. v. Commissioner, 881 F.2d at 254↩ n.2.
14. Helvering v. Le Gierse, 312 U.S. 531, 537-538↩ (1941), was not a captive insurance case but addressed the definition of insurance for purposes of sec. 302(g) of the Revenue Act of 1926, ch. 27, tit. III, 44 Stat. 9, 71, an estate tax exclusion for life insurance proceeds.
15. In AMERCO v. Commissioner, 96 T.C. 18, 38 (1991), affd. 979 F.2d 162↩ (9th Cir. 1992), we supplemented these factors with a tenet that is basic to all of our decisions: "matters of Federal income taxation must be resolved with principles of Federal income taxation borne in mind."
16. In Helvering v. Le Gierse, 312 U.S. at 539↩, the Supreme Court did not provide further definitions of the terms risk shifting and risk distribution.
17. In Rev. Rul. 77-316, 1977-2 C.B. 53, the Internal Revenue Service put forth its economic family theory. The Service analyzed three hypothetical captive insurance arrangements and found that no risk shifting or distribution of loss had occurred. Although the parent corporation, its subsidiaries, and the captive insurance subsidiary were all separate corporate entities, the Service concluded that they represented one economic unit because "those who bear the ultimate economic burden of loss are the same persons who suffer the loss." 1977-2 C.B. at 54. As a result, the Service determined that a deduction would not be allowed under sec. 162 because the captive insurance agreement merely sought to obtain indirectly a deduction that could not be obtained directly through self-insurance. This Court has expressly rejected the economic family theory. Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61 (1991), supplemental opinion 96 T.C. 671, affd. in part and revd. in part 972 F.2d 858 (7th Cir. 1992); The Harper Group & Includible Subsidiaries v. Commissioner, 96 T.C. 45 (1991), affd. 979 F.2d 1341 (9th Cir. 1992); AMERCO v. Commissioner, 96 T.C. 18 (1991), affd. 979 F.2d 162 (9th Cir. 1992); Gulf Oil Corp. v. Commissioner, 89 T.C. 1010 (1987), affd. 914 F.2d 396↩ (3d Cir. 1990).
18. A corporation with a valid business purpose must be treated as a "separate taxable entity". Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Thus, it follows that a parent corporation and its subsidiary corporation must be treated as separate taxable entities in the captive insurance context absent a "sham" corporation or lack of business purpose. See National Carbide Corp. v. Commissioner, 336 U.S. 422↩ (1949).
19. As we have stated, the capitalization agreement in Carnation was one of several factors considered in that case. However, the decision in Carnation primarily turned upon the "balance sheet" test as the Ninth Circuit later pointed out in Clougherty Packing Co. v. Commissioner, 811 F.2d at 1303. The decision in Beech Aircraft Corp. v. United States, 797 F.2d 920↩ (10th Cir. 1986), turned upon the economic family theory. Here, Malone & Hyde was not required to contribute additional capital to Eastland. Malone & Hyde was required to defend and hold harmless Northwestern against any claims only if Eastland defaulted on its obligations as reinsurer.
20. Footnote 15 of Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1027-1028 (1987), reads as follows: In order to determine whether a substantial proportion of unrelated premiums are paid to a captive, we must assume that reliable actuarial estimations of risk of loss have been used to arrive at the amount of each insured's premium payment. The parties in this case did not directly address this issue of whether premiums paid to Insco were negotiated on this basis, and at arm's length. It appears that during 1974 and 1975, the premiums paid were greatly in excess of the actual losses paid. While this could be due to an extraordinarily low loss year, it could also be a result of excessive premiums. Without concluding which may have been the case here, we note that excessively large premium payments can be indicative of what is in substance a risk-retention arrangement, which would support our conclusion that risk transfer was not present in those years.↩
21. Respondent contends that a wide disparity exists between the premiums allocated to Petty's Drug Company in fiscal year 1979 ($ 52,063) when Petty's losses were only $ 3,143 and that of Super D Drugs ($ 31,458) which had losses of $ 13,928 and in the preceding year had had losses of $ 61,186. Respondent also notes that Petty's was allocated premiums for the 2 fiscal years at issue of $ 99,692, with losses of only $ 4,813, while Super D Drugs had premiums of only $ 131,601 with losses of $ 92,840 for 3 years. In addition, respondent compares the premiums allocated to Raleigh Foods for 3 years ($ 6,132) and its losses of $ 13,099. Middle Florida Supermarkets was charged with premiums of $ 168,310 while showing losses of $ 131,927 during the 2-1/2 years before merging with Malone & Hyde. Finally, respondent contends that subsidiaries that reflected little or no losses were nevertheless allocated the following amounts: Hyde Insurance Agency had total premiums allocated of $ 16,858 with losses of only $ 3,541; Malone & Hyde, Inc. of Arkansas had premiums allocated for 3 years in the amount of $ 20,621 with no losses; and UDISCO was charged $ 62,709 in fiscal year 1980 when no losses were shown with respect to such period. Petitioner explains that the 1980-1981 worksheet only contains information about the 3 preceding years. Thus, it is impossible to draw any comparisons between the premiums charged to Super D Drugs in fiscal 1979 and the premium charged to Petty's Drug Company for the same year without knowing their respective loss experiences for the years 1976 through 1978, which were not available on the 1980-1981 worksheet. Furthermore, Petty's was not acquired by Malone & Hyde until July 1, 1978. The Risk Management Department had to use premium figures charged by other insurance carriers in determining an allocation for a newly acquired subsidiary. The same approach was taken with Middle Florida Supermarkets, which was acquired in December of 1977. Petitioner also asserts that the same is true for Living Homes: when Malone & Hyde organized Living Homes, it obviously had no losses but nevertheless had to pay for a portion of the insurance coverage provided by Northwestern. Petitioner asserts that, although an element of judgment was required in determining these allocations, these seeming inconsistencies are explainable, do not lead to the conclusion that the allocations were overstated, nor do they detract from petitioner's position that the allocation method used was reasonable. We agree.↩
22. Humana Inc.'s insurance carrier charged a total premium amount that was based on the application of a composite rate, developed by a rating organization, on the average number of occupied beds in the subsidiaries' hospitals. The amounts paid by Humana Inc. were subsequently charged back to the subsidiaries pursuant to an allocation formula that was also based on the number of occupied beds. Adjustments were made if a subsidiary's hospital had a teaching program, an intern residence program, or nurse anesthetists. See Humana Inc. v. Commissioner, 88 T.C. at 203↩ n.10.
23. The law of large numbers is a subpart of the statistical theory of probability. As the number of exposures increase, the actual results achieved begin to approach the probable results expected if an infinite number of exposures could occur. According to this statistical law, one can make relatively accurate predictions of the frequency of an event's occurrence. For example, when flipping a coin, the probability of tossing heads is one in two. However, the probability of tossing heads 49 percent to 51 percent of the time in 100 tosses is only 16 percent. This probability increases to 47 percent after 1,000 tosses and reaches 95 percent after 10,000 tosses. Thus, "By applying the law of large numbers in appropriate contexts, an insurance company can set rates at a level that will increase the likelihood that premium payments received will be adequate to meet losses." Taylor, "Taxing Captive Insurance: A New Solution for an Old Problem", 42 Tax Lawyer 859, 879 (1989); see also Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1025↩ n.9 (1987). It should be noted that Mr. Taylor critically questions the efficacy of using the law of large numbers in this context. We do not purport to address the questions its application raises; we merely present this explanation for information purposes.